**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN A. KESSE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-6265 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After plaintiff John A. Kesse ("Kesse") was involved in a car accident while driving a

vehicle manufactured by defendant Ford Motor Company ("Ford"), plaintiff sued Ford.[1]

Defendant has filed a motion for summary judgment and a motion *in limine* to exclude the

testimony of plaintiff's proposed expert witness. For the reasons set forth below, the Court

grants defendant's motion *in limine* and grants the motion for summary judgment.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[2]

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). Plaintiff Kesse is a
citizen of Illinois [Docket 132 at ¶ 1]; defendant Ford is a citizen of Delaware (its state of
incorporation) [Docket 129 at ¶ 2] and Michigan (where it has its principal place of business)
[Docket 88 at ¶ 2]; and the amount in controversy is greater than $75,000.00 [Docket 132 at ¶ 3].

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like
considered in connection with a motion for summary judgment. The Court enforces Local Rule
56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails
to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.
*See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v.
Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however,
absolve the party putting forth the fact of the duty to support the fact with admissible evidence.
*See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The Court does not consider

Plaintiff Kesse was working as a taxi driver on August 14, 2012 when he was involved in an automobile accident. At the time of the accident, Kesse was driving a 2007 Crown Victoria sedan that he leased on a day-to-day basis from its owner, BMX-Chicago and Associates. The accident occurred on the second day that Kesse had leased the 2007 Crown Victoria. The first day, Kesse had experienced no mechanical problems while driving the 2007 Ford Crown Victoria.

On the morning of August 14, 2012, Kesse was driving a passenger southbound on Milwaukee Avenue at a speed of approximately 20-25 miles per hour. As Kesse approached the intersection of Milwaukee and Noble, plaintiff heard the car make a "voom" sound and the car began accelerating quickly. Plaintiff claims he attempted to brake repeatedly (Ford disputes this), but no bystanders noticed brake lights on the car. After traveling another eight tenths of a mile, plaintiff attempted to stop the car by hitting a pole on the sidewalk. The car proceeded to hit another pole, as well as a pedestrian, who was killed. The 2007 Crown Victoria that plaintiff had been driving burned as a result of the accident.

The 2007 Crown Victoria that Kesse was driving at the time of the accident was manufactured by defendant Ford, which had sold the vehicle to an independently-owned Ford dealership on October 12, 2006. That dealership, in turn, sold the vehicle to a private owner on January 5, 2007. The 2007 Crown Victoria was sold with a three-year warranty, which expired on January 5, 2010.

The remaining evidence the parties have put forth in connection with defendant's motion for summary judgment is opinion evidence from their respective expert witnesses. The

---

any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

experts—Samual J. Sero ("Sero") on behalf of plaintiff and Thomas G. Livernois ("Livernois") on behalf of defendant—agree on a few details but disagree as to the cause of the accident.

The experts seem to agree that automobile engines require, among other things, air in order to operate. (Sero Report at 2; Livernois Report at 4). Opening a vehicle's throttle is what allows air to reach a vehicle's engine and, thus, the vehicle to accelerate. Traditionally, the throttle was opened by a cable connected to the accelerator pedal. Like most vehicles at the time, the 2007 Crown Victoria utilized not a cable connection between the accelerator pedal and the throttle but instead a drive-by-wire system, also known as an electronic-throttle-control ("ETC") system. (Sero Report at 2; Sero Dep. at 9; Livernois Report at 5).

Neither Livernois nor Sero examined the 2007 Crown Victoria that Kesse had driven during the accident. Instead, after the accident, the 2007 Crown Victoria was examined by Ryan Welsch ("Welsch"), a master technician. The parties' experts agree that Welsch found that there were no problems with the braking system or the electronic throttle control system (Sero Dep. at 30; Livernois Report at 10), and both proposed experts relied on Welsch's analysis in reaching their own opinions (Sero Dep. at 29-30; Livernois Report at 10).

**Sero's opinion**

Sero explains in his report that "[t]he drive-by-wire system eliminated the driver's direct mechanical connection to the throttle and placed the throttle control under the control of the vehicles [sic] electronic engine controller or EEC thereby creating a condition in which a sudden acceleration can occur at any time during the operation of a vehicle." (Sero Report at 2/Docket 128-5 at 2). That is so, because, according to Sero:

> Under the hood of a car exists not only one of the harshest physical environments for electronics with heat, dirt, moisture and corrosives; but one of the harshest EMI [electromagnetic interference] environments. Numerous EMI generating devices are in constant close proximity. The electronic components under the

hood are not only receptors of EMI they are generators of EMI. The uncontrolled
interconnection of electronic and electrical components creates a condition for
uncontrolled conductive and radiated EMI.

(Sero Report at 3/Docket 128-5 at 3). Sero opines that electromagnetic interference can cause

the throttle to open and, thus, can cause sudden acceleration. (Sero Report at 3/Docket 128-5 at

3). He says "[t]he hazards associated with EMI have been around since the advent of

electricity." (Sero Report at 3/Docket 128-5 at 3).

Sero opines "to a reasonable degree of engineering certainty that the 2007 Ford Crown

Victoria taxi cab that Mr. Kesse was driving experienced a sudden acceleration event." (Sero

Report at 5/Docket 128-5 at 5). Sero eliminated the possibility of other mechanical failure,

because Welsch found no mechanical failures in the vehicle. Sero also eliminated the possibility

of driver error, because "Mr. Kesse had no logical or sane reason to slam the accelerator pedal or

the brake pedal for that matter for the driving maneuver that he was doing." (Sero Report at

6/Docket 128-5 at 6). Sero opined that:

Mr. Kesse was at the time of the incident an experienced and professional driver.
He was accustomed to the universally, inherently safe design and orientation of
the brake and acceleration pedals. . . . With the design of the two pedals being
universal it becomes a motor memory and the movement of the foot from one
pedal to the other is an automatic safe response.

(Sero Report at 6/Docket 128-5 at 6).

Sero opines that customers should be warned, in the event of sudden acceleration, to put

the vehicle in neutral and apply the brakes without pumping. (Sero Report at 4/Docket 128-5 at

4). He opines the problem could be eliminated by "[e]liminat[ing] the cruise control and drive-

by-wire functions." (Sero Report at 5/Docket 128-5 at 5).

According to his curriculum vitae, Sero received a Bachelor of Science degree in electrical engineering from Carnegie Institute of Technology in 1967. Sero does not name any of his prior employers on his C.V., but the C.V. reflects that he has been self-employed since about 1975.

**Livernois's opinion**

Defendant's expert, Thomas G. Livernois ("Livernois") disagrees with Sero's opinion. Livernois, who received a Ph.D. in electrical engineering from the University of Michigan in 1991, opines that the "2007 Ford Crown Victoria electronic throttle control system is neither defective nor unreasonably dangerous" and that "[t]here is no evidence that electromagnetic interference caused the throttle control system in the subject vehicle to malfunction before or during the subject accident." (Livernois Report at 22/Docket 129-9 at 27).

Livernois first describes how the engine operates:

Vehicle engines need fuel, spark, and air in order to operate. The subject 2007 Ford Crown Victoria's 4.6 liter eight-cylinder engine is factory-equipped with an electronically controlled sequential multiport fuel injection (SFI) system. With this system, the vehicle's powertrain control module (PCM) individually controls the delivery of fuel to each of the eight engine cylinders through fuel injectors. The spark is delivered to the cylinders via spark plugs that receive electrical energy through individual coils on each cylinder (coil-per-plug). Finally, air is provided to the engine's cylinders via a throttle valve mounted to the intake manifold. The PCM controls the amount of fuel injected into the cylinders based on the amount of air flowing into the cylinders.

(Livernois Report at 4/Docket 129-9 at 9).

Livernois described the throttle control system as follows:

Like most vehicles produced in the model year 2007 timeframe, the subject Ford Crown Victoria was equipped with an electronic throttle control (ETC) system, also referred to as a drive-by-wire system, which controlled the throttle valve. In this system, the accelerator pedal is not physically connected to the throttle valve as in mechanical throttle systems. Rather, the driver-commanded accelerator pedal (APP) sensors are hardwired to the PCM [powertrain control module],

which calculates a target throttle valve position and controls the throttle valve position through commands to the throttle body motor.

(Livernois Report at 5/Docket 129-9 at 10). Livernois believes "[e]lectronic throttle control (ETC) provides a number of advantages over conventional cable systems including more precise control of airflow leading to lower emissions and better fuel economy, reduced maintenance due to fewer moving parts and mechanical interconnections, and the ability to implement more responsive and effective powertrain-dependent vehicle features such as electronic stability control." (Livernois Report at 5/Docket 129-9 at 10).

According to Livernois, the electronic throttle control works as follows:

The accelerator pedal contains three sensors, also known as a three-track system. . . . Each track set is provided with five-volt power and ground by the PCM. Metal wipers moving along the tracks as the accelerator pedal position is changed cause a change in voltage to be sent to the PCM. . . . [T]he use of the three independent pedal position signals ensures that the PCM receives correct driver input even if one sensor signal has a concern.

(Livernois Report at 5-6/Docket 129-9 at 10-11). Livernois notes the system is designed to overcome problems. Livernois states:

The PCM continuously monitors the ETC system performance, and engages fail-safe operation modes if abnormalities are detected within the system. This monitoring is distributed across two separate processor integrated circuit chips in the PCM: 1) the main powertrain control processor unit (CPU), and 2) the monitoring processor, which Ford calls an enhanced-quizzer or E-Quizzer. The primary monitoring function is performed by the independent plausibility check (IPC) software on the main processor. If the generated engine output torque exceeds driver demand by a set amount, the IPC takes corrective action. The E-Quizzer redundantly monitors select PCM inputs and acts as a watchdog to monitor the performance of the IPC and main processor.

(Livernois Report at 8/Docket 129-9 at 13).

Livernois does not doubt the concept of electromagnetic interference. (Livernois Report at 12/Docket 129-9 at 17) ("The automotive industry is well aware of the EMI environment

under the hood of a vehicle and has developed engineering requirements to mitigate EMI risk.").

He believes, however, that electromagnetic interference cannot cause sudden acceleration.

Livernois opined:

> Mr. Sero claims that the large number of wires connected to the PCM can electromagnetically share their signals by radiation. He claims that the throttle operation may have been activated by these cross connections by somehow providing a normal operating signal consistent with a command to open throttle. This is unsubstantiated speculation. In the 2007 Crown Victoria, multi-signal coupling is filtered out and/or mitigated by the PCM and throttle control system before an uncommanded throttle opening occurs. Furthermore, circuits terminated in low impedance loads, such as a throttle motor, do not efficiently couple radiated electromagnetic energy and are inherently immune to EMI as a result.
>
> * * *
>
> It has been shown that the simultaneous effects of multiple EMI sources provide an additive EMI effect only when there is phase coincidence among the sources at the point of reception, which occurs only for very brief time periods, if at all. If an additive effect did occur, it would start and finish before any noticeable effects to vehicle actuators occurred; this includes the throttle motor.
>
> * * *
>
> If EMI were to somehow open the throttle without driver command, as speculated by Mr. Sero, the throttle position sensors and other sensors would provide data to the PCM. The PCM would detect the discrepancy in demanded versus actual engine output torque, set one or more throttle control fault codes, and put the vehicle in reduced power, limp home mode. As a result, the vehicle would quickly come to a stop with typical brake application force.

(Livernois Report at 10-11, 12/Docket 129-9 at 15-16, 17).

Livernois's firm conducted testing on an exemplar 2007 Ford Crown Victoria. Livernois "intentionally applied" to the exemplar vehicle numerous "throttle control electrical system faults (e.g., open-circuiting a wire, shorting together two wires)," including "[a]ccelerator pedal sensor faults involving two or more of the three sensors." (Livernois Report at 19/Docket 129-9 at 24). The result "was that the vehicle reacted in a safe manner every time." (Livernois Report at 19/Docket 129-9 at 24). Livernois noted that, in his testing:

> [A] single accelerator pedal sensor being artificially pulled to a voltage consistent with a large and normal operating accelerator pedal applied input was, by design,

ignored by the PCM, because the remaining two sensors were functioning properly. The vehicle did not accelerate without driver input. This shows that a hypothetical EMI source affecting an APP input would not cause the vehicle to accelerate, as speculated by Mr. Sero.

(Livernois Report at 20/Docket 129-9 at 25).

Livernois, like Sero, relied on the Welsch report, because the actual vehicle was not available for analysis. Livernois noted that Welsch's report "shows that the subject vehicle's accelerator pedal position and throttle position sensors were functioning properly." (Livernois Report at 10/Docket 129-9 at 15). Livernois's "conclusion from the review of the inspection summary is that the electronic throttle control components were functioning as designed during the crash sequence in response to driver input." (Livernois Report at 10/Docket 129-9 at 15).

Finally, Livernois states that "Mr. Sero's opinions have been directly rebutted by the National Highway Transportation Safety Administration (NHTSA) in cases where the NHTSA has been petitioned to perform investigations into certain allegations of unintended acceleration." (Livernois Report at 15/Docket 129-9 at 20). He cited NHTSA reports, including one that stated, "SAIs [sudden acceleration incidents] typically involve vehicles that are relatively unfamiliar to the driver and occur much more frequently as driver age increases: there is a 100-600% over-involvement of drivers older than 60 years (normalized for miles driven per year) and under-involvement for drivers 15-40 years of age." (Livernois Report at 15/Docket 129-9 at 20).

Thus, in Livernois's opinion, EMI did not cause sudden acceleration of plaintiff's vehicle. Instead, Livernois opines that Sero should not have ruled out driver error as a cause of the accident. Livernois states, "The phenomenon of pedal misapplication in motor vehicles has been studied by several individuals and entities over the years." (Livernois Report at 16/Docket 129-9 at 21). In his report, Livernois cited and summarized several such studies. One study concluded "For [sudden acceleration events] in which there is no evidence of throttle sticking or

cruise-control malfunction, the inescapable conclusion is that these definitely involve the driver inadvertently pressing the accelerator instead of, or in addition to, the brake pedal." (Livernois Report at 16/Docket 129-9 at 21). Livernois cited another study that found "three general populations of drivers who make pedal application errors: (1) those with sensory defects in their feet; (2) those with cognitive limitations; and (3) those with no specific medical conditions or functional impairments, but who are influenced by situational factors that overwhelm everything else (inexperience; misfit in the vehicle; new vehicle; distraction." (Livernois Report at 17/Docket 129-9 at 22). Livernois opined, "contrary to Mr. Sero's assertions, pedal misapplication is a well-studied human factors related phenomenon that does occur." (Livernois Report at 17/Docket 129-9 at 22). Livernois concluded that "Mr. Kesse's lack of familiarity with the subject vehicle contributed to pedal misapplication." (Livernois Report at 21/Docket 129-9 at 26).

## II. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a

jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d

686, 692 (7th Cir. 2005).

## III.    DISCUSSION

### A.    Plaintiff's objection to Livernois's report

Plaintiff has not filed a *Daubert* motion to exclude plaintiff's expert on the grounds that

he is not qualified to offer an expert opinion.  Instead, plaintiff has objected to certain portions

on the grounds that Livernois did not attach to his report all of the materials he claims to have

reviewed in forming his opinion.  Specifically, plaintiff takes issue with Livernois's comments

on the findings of the National Highway Transportation Safety Administration ("NHTSA"),

because Livernois did not attach to his report the documents he cites.

Rule 26 sets out the requirements for contents of expert reports.  Pursuant to Rule

26(a)(2)(B), an expert report "must contain:

> (i)  a complete statement of all opinions the witness will express and the basis and
> reasons for them;
> (ii)  the facts or data considered by the witness in forming them;
> (iii)  any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the
> previous 10 years;
> (v)  a list of all other cases in which, during the previous 4 years, the witness
> testified as an expert at trial or by deposition; and
> (vi)  a statement of the compensation to be paid for the study and testimony in the
> case.

Fed.R.Civ.P. 26(a)(2)(B).  The Court does not see in Rule 26(a)(2)(B) a requirement that the

expert attach to his report every publication he cites.  Such publications do not constitute exhibits

to support his opinion.  Nor has plaintiff suggested that he did not have access to the cited

materials.  The NHTSA reports Livernois cites are published in the Federal Register.  *See* 65 FR

25026-01; 80 FR 27835-01.  Accordingly, plaintiff's objection to the admission of Livernois's

report is overruled.

**B.      Defendant's motion to exclude plaintiff's proposed expert**

Defendant has moved to exclude the testimony of Samuel J. Sero ("Sero"), who plaintiff has hired to provide expert testimony.

Pursuant to Rule 702 of the Federal Rules of Evidence, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.  Before allowing the admission of expert testimony, a district court must perform a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Like scientific testimony, testimony based on technical or other specialized knowledge must also be reliable to be admissible. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ("[T]he Rule applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope").  As the Supreme Court said in *Kumho*, "[e]ngineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases." *Kumho*, 526 U.S. at 150.

In performing its gatekeeping function, a district court makes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  The Supreme Court outlined factors that may be considered by district courts.  First, the Supreme Court noted:

Ordinarily, a key question to be answered . . . will be whether it can be (and has been) tested. 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'

*Daubert*, 509 U.S. at 593 (citations omitted). Second, the Supreme Court explained:

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. . . . Some propositions . . . are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration . . .

*Daubert*, 509 U.S. at 593 (citations omitted). Third, the Supreme Court suggested "the court ordinarily should consider the known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594 (citations omitted). Finally, the Supreme Court said,

"Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism.

*Daubert*, 509 U.S. at 594 (citations omitted).

The standard is flexible, and, in applying these factors, a district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152. "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho*, 526 U.S. at 153. It is the "proponent of the expert testimony" who has the burden of establishing its relevance and reliability." *Robinson v. Davol, Inc.*, 913 F.3d 690, 695 (7th Cir. 2019).

In this case, Sero opined that the vehicle plaintiff drove experienced sudden acceleration due to electromagnetic interference. He reached that conclusion, because:

> The Welsch report from the criminal trial effectively eliminated any of the mechanical aspects of the investigation as causation. This effectively leaves only the driver and the electronic control aspects of the vehicle.

(Sero Report at 6/Docket 128-5 at 6). Once Sero eliminated driver error as a possibility, he was left with electromagnetic interference.

In other words, the methodology Sero applied is essentially "differential diagnosis." As the Seventh Circuit has explained:

> "[A] differential diagnosis 'provides a framework in which all reasonable hypotheses are 'ruled' in' as possible causes of a medical problem and some of these possible causes are then 'ruled out' to the extent scientific evidence makes it appropriate to do so.'"

*Robinson*, 913 F.3d at 696 (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 903 (7th Cir. 2007). "The goal is to find the last remaining, or most probable, 'ruled in' cause of a medical problem.'" *Ervin*, 492 F.3d at 903.[3] The Seventh Circuit has also said that "though differential diagnosis is widely accepted as a general matter, an expert's decision to 'rule in' or 'rule out' potential causes must itself be 'scientifically valid.'" *Robinson*, 913 F.3d at 696 (quoting *Ervin*, 492 F.3d at 904).

That is where Sero's opinion falls short. His decisions to rule in electro-magnetic interference as a cause of the accident and to rule out driver error as a cause of the accident are not reliable. As defendant points out, Sero is not a human-factors expert, and his report makes no mention of the studies that found pedal misapplication as the most likely cause of sudden acceleration. In addition, Sero ruled out driver error without knowing how many times plaintiff had driven the vehicle. (Sero Dep. at 77, 79). This fact does not enhance the reliability of Sero's

---

[3] Differential diagnosis is a method of determining a medical diagnosis. The Court assumes, without deciding, that the method is valid outside of medicine. The Tenth Circuit has said that, outside of medicine, the method is "more aptly characterized as a process of reasoning to the best inference." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2005).

conclusion, given that the accident occurred on plaintiff's second day driving the vehicle and that the literature includes drivers of new vehicles among the most likely to make pedal errors.

The most glaring problem with Sero's opinion, though, is the decision to rule in electro-magnetic interference as a potential cause of plaintiff's accident. Sero has done none of the things that would suggest his opinion is reliable. Sero testified that he has done no testing for this case. (Sero Dep. at 66). More specifically, Sero has *never* performed any testing on a vehicle with electronic throttle control. (Sero Dep. at 102). Sero has never been able to cause an unintended acceleration event with electromagnetic interference in an automobile. (Sero Dep. at 105). Not only has Sero not done his own testing, but he also does not rely on testing done by anyone else. (Sero Dep. at 100). In fact, Sero is not aware of anyone else who has been able to use electromagnetic interference to open a throttle in a vehicle with electronic throttle control. (Sero Dep. at 103). Sero's hypothesis is simply untested.

In addition, although Sero claims to have been a proponent of this theory since 1997, Sero testified at his deposition that he has never published a peer-reviewed article on unintended acceleration, on electro-magnetic interference in automobiles or on electronic throttle controls. (Sero Dep. at 25). Nor does the record contain any evidence that Sero's theory has achieved widespread acceptance. To the contrary, Sero admits that the National Highway Transportation Safety Administration has concluded that Sero's theory has no merit. (Sero Dep. at 26). These factors cut strongly against a finding of reliability.

Instead of the usual scientific method (testing, publishing, widespread acceptance), Sero relies on anecdotal evidence: his report mentions two instances where drivers reported sudden acceleration in drive-by-wire vehicles they drove. (Sero Report at 1/Docket 128-5 at 1). Sero does not claim to have investigated those incidents. Sero's theory remains a mere hypothesis,

and hypotheses alone are not admissible.  *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017) ("Sero's failure to test his hypothesis renders his opinions on the cause of Howard's accident unreliable.  Although Sero's theory is plausible and 'may even be right[,] . . . it is no more than a hypothesis, and it thus is not knowledge'") (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)).

In sum, Sero's opinion that Kesse's accident in the 2007 Crown Victoria resulted from sudden acceleration due to electro-magnetic interference is not reliable and is mere speculation.  Accordingly, it is not admissible.  *Daubert*, 509 U.S. at 590 ("[K]nowledge" in Rule 702, "connotes more than subjective belief or unsupported speculation.").  This Court is not alone in excluding testimony that electro-magnetic interference caused sudden acceleration.  *See Baker v. Mercedes Benz of North Am.*, 163 F.3d 1356 (table) (5th Cir. 1998) (affirming exclusion of expert testimony that electromagnetic interference caused accident, because the theory had not been tested); *Buck v. Ford Motor Co.*, 810 F Supp.2d 815, 831 (N.D. Ohio 2011) ("Sero has not reliably ruled in EMI as a potential cause of sudden acceleration, because he has not 'supplemented his conclusions based on general engineering principles with reliable methodology.' . . . Sero's opinion lacks the indicia of reliability as set forth in *Daubert*.  Sero's theory has not been:  1) verified through testing; 2) published or peer reviewed; 3) generally accepted.") (internal citations omitted).

Accordingly, defendant's motion to exclude Sero's opinion and testimony is granted.

## C.    Plaintiff's negligence claim

In Count I, plaintiff asserts a claim for negligent design and failure to warn.  As the Supreme Court of Illinois has explained:

A product liability action asserting a claim based on negligence, such as negligent design, falls within the framework of common-law negligence.  Thus, a plaintiff

must establish the existence of a duty of care owed by the defendant, a breach of that duty, injury that was proximately caused by that breach, and damages.

*Calles v. Scripto-Tokai Corp.*, 224 Ill.2d 247, 270 (Ill. 2007) (citations omitted). This means "evidence from which a reasonable jury could infer that any defect in [the vehicle] probably contributed to the crash." *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 771 (7th Cir. 2015).

The Court agrees with defendant that plaintiff has failed to put forth evidence from which a reasonable jury could conclude that plaintiff's accident was caused by a defect. Plaintiff's only evidence as to causation is Sero's opinion, and this Court has already concluded that Sero's opinion is inadmissible. Accordingly, defendant is entitled to judgment as a matter of law on the negligent-design claim.

Similarly, plaintiff has failed to establish that defendant had a duty to warn. "[W]hen a design defect is present at the time of sale, the manufacturer has a duty to take reasonable steps to warn at least the purchaser of the risk as soon as the manufacturer learns or should have learned of the risk created by its fault." *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 111, 955 N.E.2d 1138, 1159 (Ill. 2011). Plaintiff, though, has not put forth sufficient evidence from which a reasonable jury could conclude that the 2007 Crown Victoria had a design defect. *See Thornton*, 796 F.3d at 773 ("[W]e agree with the district court that [defendant] did not have a duty to warn the initial purchaser. That is because the plaintiffs have not established that there was any 'defect' in the design[.]"). Plaintiff's only evidence of a design defect is Sero's opinion. Again, the Court has concluded that Sero's opinion is inadmissible. Accordingly, plaintiff's failure-to-warn claim fails.

Defendant is entitled to judgment as a matter of law on Count I, and its motion for summary judgment on Count I is granted.

**D.     Plaintiff's claim for breach of express warranty**

In Count II, plaintiff asserts that defendant breached an express warranty under 810 ILCS 5/2-313.  A federal court considering a claim under Illinois law attempts "to predict how the Illinois Supreme Court would decide the issues presented here." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018).  "Express warranties by the seller are created as follows:  (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  810 ILCS 5/2-313.

"[A]n express warranty is a creature of contract." *Collins Co., Ltd. v. Carboline, Co.*, 125 Ill.2d 498, 509 (Ill. 1988).[4]  Thus, a claim for breach of express warranty requires privity of contract.  *See Collins Co., Ltd. v. Carboline Co.*, 125 Ill.2d 498, 516 (Ill. 1988) (noting its decision did not "extend express warranties to nonprivity plaintiffs"); *see also Kmak v. Sorin Group Deutschland GmbH*, Case No. 17 CV 4759, 2017 WL 8199974 at *5 (N.D. Ill. 2017) ("Generally, a party must have privity of contract in order to bring a cause of action for breach of express warranty.").  Nonetheless, privity can be found where an express warranty has been assigned.  *Collins*, 125 Ill.2d at 507-8 ("[T]he assignee of a warrantee's rights under an express warranty, if the assignment is otherwise valid, succeeds to all those rights and thus stands in privity with the warrantor.").  In this case, plaintiff has not put forth evidence (or argued that) the warranty was assigned to him.

---

[4] Defendant waited until its reply brief to argue that plaintiff failed to put forth any evidence of a warranty provision that defendant breached.  Specifically, defendant argues that plaintiff did not introduce into evidence a copy of the warranty or identify any provisions that defendant breached.  The Court agrees, but the argument came too late.  Arguments made for the first time in a reply brief are waived.

Instead, plaintiff argues that he is a third-party beneficiary entitled to enforce a warranty pursuant to 810 ILCS 5/2-318. That section provides that "[a] seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured by the breach of warranty." 810 ILCS 5/2-318. Plaintiff has not put forth evidence (or argued) that he is in the family or household of the buyer or was a guest of the buyer. Rather, plaintiff cites *Whitaker v. Lian Feng Mach. Co.*, 156 Ill.App.3d 316, 321 (1st Dist. 1987), where the Illinois Appellate Court allowed an employee of the purchaser to sue for breach of warranty, noting that "[a] corporation cannot use the [purchased product] at all unless its employees operate it." Plaintiff, though, has put forth no evidence that he was an employee of the purchaser. The undisputed evidence is that plaintiff leased the vehicle from the owner. This Court has no reason to think the Illinois Supreme Court would extend 810 ILCS 5/2-318 beyond employees, and a federal court sitting in diversity jurisdiction "must be reluctant 'to expand state law.'" *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1004 (7th Cir. 2006) (quoting *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1034 (7th Cir. 2005)). Because plaintiff has not put forth evidence of privity of contract, his claim for breach of express warranty fails as a matter of law.

As a separate reason to grant summary judgment in its favor on Count II, defendant argues that plaintiff's claim for breach of express warranty is time-barred. An Illinois statute states, "An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." 810 ILCS 5/2-725. The statute goes on to say:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time

> of such performance the cause of action accrues when the breach is or should
> have been discovered.

810 ILCS 5/2-725(2) (emphasis added). Thus, the Illinois Supreme Court, "adhering to the clear language of the statute," has confirmed, "[t]he cause of action accrues when tender of delivery is made, except upon a warranty *explicitly* extending to future performance." *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 94 (Ill. 1982) (emphasis added) ("The mere expectation that a product's warranty extends for the life of the product does not delay the point at which the statute of limitations commences to run."). Here, plaintiff has not included the alleged express warranty in his statement of facts and, hence, has not shown that the warranty *explicitly* extends to future performance. Accordingly, the express warranty claim accrued upon "tender of delivery." 810 ILCS 5/2-725(2). Defendant has put forth undisputed evidence that tender of delivery occurred January 5, 2007, which means the statute of limitations expired in January 2011, more than three years before plaintiff filed his suit.

Nonetheless, plaintiff argues that the statute of limitations was extended by Ford's "fraudulent concealment of the sudden acceleration potential of the subject vehicle." (Plf. Brief/Docket 134 at 15). An Illinois statute provides:

> If a person liable to an action fraudulently conceals the cause of such action from
> the knowledge of the person entitled thereto, the action may be commenced at any
> time within 5 years after the person entitled to bring the same discovers that he or
> she has such cause of action, and not afterwards.

735 ILCS 5/13-215. Section 13-215 does plaintiff no good for two reasons. First, the Court concludes that it is not applicable to claims for breach of warranty. *See Karpowicz v. General Motors Corp.*, Case No. 97 C 1390, 1997 WL 285943 at *5 (N.D. Ill. May 23, 1997) ("Even a claim of fraudulent concealment does not toll the statute of limitations, because the breach of warranty is deemed to occur at the time of delivery, regardless of the purchaser's knowledge.");

*Doha v. Alcon (Puerto Rico), Inc.*, Case No. 92 C 2624, 1994 WL 395000 at *4 (N.D. Ill July 26, 1994) ("Because Illinois courts have consistently declined to apply the discovery rule to the warranty statute of limitations, we hold that fraudulent concealment does not provide a tolling exception to that limitations period.").

Even were fraudulent concealment a means for extending the breach-of-warranty statute of limitations, plaintiff has failed to create an issue of fact as to fraudulent concealment. As the Illinois Supreme Court has explained:

> The concealment contemplated by section 13-215 must consist of *affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim,* or to prevent a claimant from discovering a claim. *Mere silence on the part of the defendant is insufficient.* A plaintiff must plead and prove that the defendant made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and *upon which the plaintiff detrimentally relied*.

*Orlak v. Loyola Univ. Health System*, 228 Ill.2d 1, 18 (Ill. 2007) (emphasis added) (internal citations omitted). Plaintiff's argument is that Ford was aware of sudden acceleration events but did not issue a warning. That does not suffice, because mere silence is not enough. Plaintiff needed to put forth evidence that Ford engaged in affirmative actions to lull plaintiff into delay, and plaintiff needed to put forth evidence that he detrimentally relied on those affirmative actions. Plaintiff has not put forth such evidence. Defendant has shown that it is entitled to judgment as a matter of law on its statute of limitations affirmative defense.

For these reasons, defendant's motion for summary judgment is granted as to Count II.

## IV.     CONCLUSION

For all of these reasons, the Court grants defendant's motion [127] to exclude the

testimony of plaintiff's expert witness and grants defendant's motion [130] for summary

judgment.  Civil case terminated.

SO ORDERED.                                              ENTERED:  February 20, 2020

_____
HON. JORGE ALONSO
United States District Judge